**Dated: January 10, 2024.**

_____
**CHRISTOPHER G. BRADLEY
UNITED STATES BANKRUPTCY JUDGE**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| STEEPOLOGIE, LLC | § | CASE NO. 23-10671-cgb |
| Debtor. | § | (Chapter 11) |

## OPINION AND ORDER DENYING
## MOTION TO COMPEL PAYMENT OF POST-PETITION RENT

### Introduction

In late August, the debtor in this case filed bankruptcy. The debtor should have paid the landlord its September rent in a timely fashion, but it did not. The debtor did, however, vacate the premises and move to reject the lease, both before the end of September.

The landlord seeks to compel the debtor to pay the missing rent immediately. But because, under the circumstances, that relief is not warranted, the landlord's claim should be allowed as an administrative expense claim arising under §503(b) of the Bankruptcy Code, to be paid alongside other such claims.

## Procedural Background

On September 23, 2023, Alderwood Mall LLC (the "Landlord") filed a Motion to Compel Payment of Post-Petition Rent (the "Motion").[1] Steepologie, LLC (the "Debtor") filed a Response to the Motion (the "Response")[2] on October 11, 2023. A week later, the Landlord filed a Reply to the Debtor's Response (the "Reply"),[3] and the next day, the Debtor filed a Brief in Support of Response to Motion to Compel (the "Debtor's Brief").[4]

The Court conducted a hearing on the Motion on October 23, 2023 (the "Hearing"). Counsel for the Debtor and counsel for the Landlord appeared at the Hearing and at its conclusion, the Court took the matter under advisement. The Court has considered the Motion, the Response, the Reply, the Debtor's Brief, the exhibits, and the statements and arguments of counsel at the Hearing. The Motion will be denied for the reasons set forth below.

## Factual Background

On August 25, 2023, the Debtor filed a Voluntary Petition under Chapter 11, Subchapter V of Title 11 of the United States Code (the "Bankruptcy Code").[5] The Debtor is a national tea retailer that sells over 250 loose leaf teas, herbals and blends, bagged teas, and teaware. The Debtor launched its business online in 2016 and opened its first retail location in 2017. The Debtor also signed leases for many locations that were never opened. After filing bankruptcy, the Debtor apparently intended to assume two unexpired leases for retail locations in Lynwood, Washington and Austin, Texas, but it has since closed both locations and switched to an entirely online presence. This opinion concerns a lease for the Lynwood location, which is in Alderwood Mall (the "Alderwood Mall Lease").

---

[1] Dkt. No. 32.
[2] Dkt. No. 41.
[3] Dkt. No. 49.
[4] Dkt. No. 53.
[5] Dkt. No. 1.

On the Petition Date, the Debtor filed a Motion to Reject Unexpired Leases of Non-Residential Real Property and Executory Contract Nunc Pro Tunc,[6] seeking to reject fourteen leases. No one objected, and the Court granted that relief.[7] On September 18, 2023, the Debtor filed a Second Motion to Reject Leases of Non-Residential Real Property and Executory Contract,[8] seeking to reject two more unexpired leases, including the Alderwood Mall Lease. The Debtor proposed to reject that lease effective September 30, 2023. Again, in the absence of objection, the Court granted this relief.[9]

On September 28, 2023, the Landlord filed the Motion,[10] seeking immediate payment of post-petition rent and charges of $6,980 for September 2023. Specifically, the Landlord asserts an "administrative claim" for $6,980 and requests that the Court compel the Debtor to "immediately" pay the unpaid post-petition, pre-rejection rent and charges due under the lease.[11] The Landlord cites §365(d)(3) of the Bankruptcy Code, which requires debtors in possession to timely perform lease obligations arising from and after the petition date. The Motion also requests attorney fees in the amount of "at least" $1,000.[12]

In the Response, the Debtor does not dispute that the Landlord is entitled to an administrative claim in the amount of $6,980 for September post-petition rent. Rather, the Debtor asserts that the administrative claim for unpaid rent may be paid over the life of its plan of reorganization (the "Plan").[13]

---

[6] Dkt. No. 5.
[7] Dkt. No. 13.
[8] Dkt. No. 26.
[9] Dkt. No. 44.
[10] Dkt. No. 32.
[11] In the alternative, the Landlord requests adequate protection but states that "the only form of adequate protection that would even approach acceptability would be timely cash payments equal to the amount of rent and charges accruing under the Lease for the use of the Premises for all dates subsequent to the Petition Date and prior to the effective date of rejection." Dkt. No. 32 at 6 n.3.
[12] This opinion does not discuss the attorney's fees because, given the holding, it would not make a difference at this point. Courts have differed on whether attorney's fees are included within the scope of §365(d)(3). *See, e.g., In re Beltway Med., Inc.*, 358 B.R. 448, 452–53 (Bankr. S.D. Fla. 2006) (collecting cases on both sides and holding that fees should be included).
[13] Dkt. No. 68 at 4.

The Motion really presents two issues: (1) Whether §365(d)(3) mandates that courts must immediately compel payment of rent when the debtor does not timely pay it, and (2) if not, whether the facts and circumstances presented here support the Court's exercise of discretion to compel payment.

The Court answers "no" to both questions. Failure to pay under §365(d)(3) leads to an administrative claim under §503(b), not a free-floating, superpriority claim under §365(d)(3) itself. And while other remedies—such as lifting the stay to permit eviction or shortening the assume/reject deadline or even ordering immediate payment—may be available where circumstances dictate, those remedies are not warranted here.

## Jurisdiction and Authority

This Court has jurisdiction over the Motion under 28 U.S.C. §§157 and 1334. The Motion arises under the Bankruptcy Code and in a bankruptcy case referred to this Court.[14] This is a contested matter brought pursuant to 11 U.S.C. §365(d)(3) and Rule 9014 of the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Western District of Texas. This is a core proceeding within the meaning of 28 U.S.C. §157(b)(2)(A), (B) and (O). Venue is proper under 28 U.S.C. §1409(a). The Court has constitutional authority to determine this matter because it arises from the claims allowance process.[15]

---

[14] *See* Order of Reference of Bankruptcy Cases and Proceedings (W.D. Tex. Oct. 4, 2013).
[15] *Stern v. Marshall*, 564 U.S. 462, 474–478, 499 (2011).

## Analysis

### A. Failure to pay §365(d)(3) obligations gives rise to an administrative claim under §503(b).

The Debtor asserts that unpaid post-petition, pre-rejection rent gives rise to an administrative expense allowable under §503(b), but the Landlord argues, instead, that it brings a right to immediate payment under §365(d)(3).

Section 365(d)(3) states in relevant part:

> The trustee shall timely perform all the obligations of the debtor … arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.[16]

This provision does not state what happens if a trustee—or, as here, a debtor-in-possession acting as trustee—fails to make these lease payments. But §503(b) is the Code provision that permits the Court to allow claims arising from the administration of the estate. Section 507(a)(2) provides for payment of §503(b) administrative claims, which are accorded a high priority in the payment waterfall of that section. While Courts have flexibility in ordering how and when administrative claims are paid,[17] usually, in a Chapter 11 case, they must be paid in cash by the effective date of a plan of reorganization.[18] The new (as of 2021) Subchapter V of Chapter 11 relaxes that requirement somewhat for some plans,[19] but the point remains that administrative claims are usually allowed, and given a high payment priority, under §503(b) and §507(a)(2).

In line with this reasoning, the most persuasive case law holds that *the usual remedy for the failure to make a §365(d)(3) payment is a right to payment of that amount in full as an administrative claim under §503(b)*. The Court will refer to this as the "**Automatic §503(b) Claim Approach.**"

---

[16] The provision also allows debtors to seek an extension of this payment obligation, but the Debtor did not move for an extension. The Debtor did, however, surrender the premises and seek to reject the lease within a month of its bankruptcy filing.
[17] §507.
[18] §1129(a)(9).
[19] §1191(b).

The Automatic §503(b) Claim Approach gives landlords significant relief as compared with most administrative claimants, in that they need not prove that the use of their premises provided any "actual, necessary" benefit to the estate, nor are their claims limited to the fair and reasonable value of such benefit.[20] That is why §365(d)(3) provides that the lease payments are due "notwithstanding section 503(b)(1)," which is the subsection that generally requires administrative claimants to demonstrate that their claim arises from a benefit to the estate.

Nor does the Automatic §503(b) Claim Approach reward gamesmanship by debtors or give debtors a free pass. In addition to holding a §503(b) administrative claim, landlords can also seek other forms of relief if debtors are taking advantage of the situation by remaining in the property and not paying rent.[21] These other types of relief are discussed in the following section of this opinion.

One objection to this approach is that §365(d)(3) claims are not *expressly* included on the list of types of claims to be allowed under §503(b). But the Code's own rules of construction state that the word "including" is "not limiting."[22] The importance of this rule of construction has long been recognized with respect to various parts of the Code.[23] Thus, the Code explicitly permits the addition of other

---

[20] §503(b)(1). Some authority (discussed below) has doubted this, but the great weight of authority recognizes this benefit of §365(d)(3) for landlords. *See, e.g.*, *In re Pacific–Atlantic Trading Co.*, 27 F.3d 401, 405 (9th Cir. 1994) ("[S]ection 365(d)(3) expresses the intent of Congress to secure for lessors the full amount of rent due during the 60–day period while the trustee determines to accept or reject the lease, *regardless of any benefit to the estate*" (emphasis added)).
[21] *In re Tammey Jewels, Inc.*, 116 B.R. 292, 294 (Bankr. M.D. Fla. 1990).
[22] *See* §102(3).
[23] *See, e.g.*, *U.S. Bank Nat. Ass'n v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 390 (2018) ("Because of the word 'includes' in [§101(31)], courts have long viewed its list of insiders as non-exhaustive."); *Think3 Litig. Trust v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147, 190 (Bankr. W.D. Tex. 2015) ("Section 101(31) uses the word 'includes,' prior to defining the non-exhaustive list of statutory insiders. This manifests Congressional intent that 'insiders' may exist who are not specifically listed as part of the statutory definition."); *In re Downtown Properties, Inc.*, 162 B.R. 244, 248 (Bankr. W.D. Mo. 1993) (finding that "[t]he enumerated factors are not exclusive" when permitting dismissal of a Chapter 11 case for cause); *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 849 (Bankr. S.D.N.Y. 1989) ("Section 102(3) of the Code provides that the word 'including' is not limiting. Consequently, the appearance of the word 'including' in § 1109(b) renders the list of who may be a party in interest as not all inclusive."); COLLIER ON BANKRUPTCY ¶ 102.04 (Richard Levin & Henry J. Sommer eds., 16th ed.) (discussing cases).

administrative expenses to be "included" as §503(b) administrative claims and claims under §365(d)(3) are excellent candidates for such inclusion.[24]

Another objection is that §503(b) requires a "notice and a hearing" for a claim to be paid, whereas §365(d)(3) orders payment of the debtor's "obligations" without such a requirement. However, there are other sorts of obligations, for instance those arising from ordinary course transactions under §363(c)(1), that can be paid without court consideration as a routine matter but that if left unpaid give rise to an administrative claim that has to be asserted and allowed pursuant to §503(b). Indeed, the Fourth Circuit—in interpreting §365(d)(10), a provision that is identical in relevant language to §365(d)(3) and that is now located at §365(d)(5)[25]—considered the existence of a claim procedure a plus for the Automatic §503(b) Claim Approach:

> §365(d)(10) says nothing one way or the other about the procedure for asserting a claim against the estate. If a claim for payments due under §365(d)(10) is a claim for an administrative expense under §503(b), however, a procedural framework is already in place. … Accordingly, our construction—that a claim for unpaid lease payments due under §365(d)(10) is a §503(b) administrative expense claim—provides clear direction as to how such a claim is asserted, considered, and determined.[26]

As noted, the Court's assessment of the case law as a whole is that the Automatic §503(b) Claim Approach has been adopted or endorsed by the most

---

[24] As the Fourth Circuit has explained:

> Section 365(d)(10) says only that a trustee "shall timely perform ... notwithstanding section 503(b)*(1)*." The proviso did not use the broader language, "notwithstanding §503(b)," which would have exempted a claim for payments due under §365(d)(10) from all requirements of §503(b). This reading is consistent with §503(b)'s terms, which contemplate that a bankruptcy court may award administrative expenses for claims other than those specifically listed in §503(b)(1) – (6).

*In re Midway Airlines Corp.*, 406 F.3d 229, 237 (4th Cir. 2005) (emphasis in original). *Midway Airlines* dealt with the former §365(d)(10) (now located at §365(d)(5)). Because the provisions are so similar, "in construing §365(d)(10) [now §365(d)(5)], courts often look to decisions construing §365(d)(3)." *Midway Airlines*, 406 F.3d at 234.
[25] *In re Simbaki, Ltd*, No. 13-36878, 2015 WL 1593888, at *3 n. 2 (Bankr. S.D. Tex. Apr. 3, 2015).
[26] *Midway*, 406 F.3d at 239–40.

persuasive authorities, including the Fourth Circuit in *Midway Airlines*,[27] the Western District of Texas bankruptcy court in *Bella Logistics*,[28] the Northern District of Texas bankruptcy court in *Imperial Beverage*,[29] the Southern District of Texas bankruptcy court in *Simbaki*,[30] and the Collier's treatise.[31]

But this is not to say there is unanimity on the issue. The issue has come up many times over the decades since §365(d)(3), and the essentially identical provision, §365(d)(5) (originally located at §365(d)(10)), came into law. The cases and situations in which it has come up are manifold. A brief survey of the other approaches is helpful in explaining why the Court follows the Automatic §503(b) Claim Approach.

Nearly every court characterizes unpaid §365(d)(3) obligations as "administrative claims" or "administrative expenses" because those are the general terms used in bankruptcy law for fees incurred in administering the bankruptcy estate that is created upon the filing of a bankruptcy petition. But from that point of general agreement, courts have split in several different ways.

Some courts have taken a restrictive approach and have stated that upon the failure to pay §365(d)(3) obligations timely, the landlord holds not just an automatic, general §503(b) claim but has to assert a traditional §503(b)(1)(A) claim.[32] This restrictive approach requires the landlord to run the gauntlet of showing that the lease obligations were reasonable and necessary costs of preserving the estate.[33] It puts the landlord at significant risk of not receiving payment on the obligations due under the lease.[34] This approach is hard to square with the statutory text that says the obligation to pay rent is "notwithstanding section 503(b)(1)," which most courts have thought expressly relieves the landlord of these burdens; indeed, many courts have viewed the relief of those burdens as the primary purpose of §365(d)(3).

---

[27] *In re Midway Airlines Corp.*, 406 F.3d 229 (4th Cir. 2005).
[28] *In re Bella Logistics LLC*, 583 B.R. 674 (Bankr. W.D. Tex. 2018).
[29] *In re Imperial Beverage Grp., LLC*, 457 B.R. 490 (Bankr. N.D. Tex. 2011).
[30] *In re Simbaki, Ltd*, No. 13-36878, 2015 WL 1593888 (Bankr. S.D. Tex. Apr. 3, 2015).
[31] COLLIER ON BANKRUPTCY, *supra*, ¶ 365.04[1][b] (stating that the Automatic §503(b) Claim Approach "seems warranted").
[32] *Midway Airlines*, 406 F.3d at 235 (describing and critiquing this approach).
[33] *Imperial Beverage*, 457 B.R. at 497–99 (noting this problem).
[34] *Great W. Sav. Bank v. Orvco, Inc. (In re Orvco, Inc.)*, 95 B.R. 724, 726 (B.A.P. 9th Cir. 1989).

Perhaps to avoid this pitfall, other courts merely say that the claim is an administrative one and see it as arising under §365(d)(3) itself, or under some combination of that and other provisions.[35] The Court will call this the "**§365(d)(3) Administrative Claim Approach**." This general approach (which has several variations) has been characterized as a "majority" view by the Collier's treatise and several relatively recent decisions (perhaps on the strength of Collier's statement),[36] although, as noted, both Collier's and several of those decisions have disagreed with it.

Of the courts that find a claim under §365(d)(3) itself, some hold that the claim should be paid alongside other administrative claims or simply do not reach this issue, due to the procedural posture in which the issue was presented. But another subset of these courts[37] holds that lessors should take *above* other administrative claimants—in other words that the §365(d)(3) claims are *entitled to a superpriority above even the already high priority of administrative claimants*. The Court will call this the "**§365(d)(3) Superpriority Claim Approach**." This is the approach that the Landlord urges the Court to take here.

The §365(d)(3) Superpriority Claim Approach faces several major problems. One problem is that Congress has expressly provided superpriority for some types of claims: Congress knows how to give such superpriority expressly, and it has not done so here.[38]

---

[35] For instance, a combination of §365(d)(3), §363(c)(1), and §105(a). *See In re J.T. Rapps, Inc.*, 225 B.R. 257, 261–62 (Bankr. D. Mass. 1998) (discussing this reasoning but declining to follow it); *In re Telesphere Commc'ns, Inc.*, 148 B.R. 525, 531 (Bankr. N.D. Ill. 1992).

[36] *See, e.g., Bella Logistics*, 583 B.R. at 679–81 (citing *Simbaki*, 2015 WL 1593888, at *3–4); COLLIER ON BANKRUPTCY, *supra*, ¶ 365.04[1][b]. The empirical foundation for the majority characterization is not clear.

[37] Although counting cases in this area is somewhat treacherous due to the varied procedural postures in which the issues are presented, the super-priority approach is certainly a minority approach. *See, e.g., In re Microvideo Learning Sys., Inc.*, 232 B.R. 602, 605–06 (Bankr. S.D.N.Y.) (noting that "[t]he vast majority of courts have held that §365(d)(3) does not create, sub silentio, an additional class of super-priority administrative claims," and collecting many citations), *aff'd* 227 F.3d 474 (2d Cir. 2000).

[38] *See* §726(b) (elevating administrative claims from a Chapter 7 case over those from a prior Chapter 11 case); §364(c)(1) (granting superpriority for certain postpetition borrowing); §507(b) (triggering superpriority for failure to provide adequate protection).

Another is that it is unclear where an implied, free-floating §365(d)(3) superpriority claim should fall with respect to *other* superpriority claims. This contrasts with those other claims, which are expressly situated at known points within the payment waterfalls and priorities ordained by the Code.[39] Viewing the statute as a whole, it seems implausible that Congress intended §365(d)(3) as a wrench thrown into this express and finely calibrated scheme.

A version of this same problem applies to the §365(d)(3) Administrative Claim Approach (which is really just a less extreme version of the §365(d)(3) Superpriority Claim Approach). As the *Simbaki* opinion explains, the statute lacks guidance on where to prioritize a §365(d)(3) claim as compared with "normal" §503(b) administrative claims:

> Section 507 of the Code, which sets forth the priority of payments in a bankruptcy case, gives high priority to "administrative expenses allowed under section 503(b) of this title," but makes no mention of claims under § 365(d). *See Midway,* 406 F.3d at 238. "Thus, even if § 365(d)(3) created an independent administrative expense claim, the Bankruptcy Code's plain language precludes the 'conclusion that [such a] claim is entitled to priority comparable to that of a § 503(b) claim." *In re Imperial Beverage Group, LLC,* 457 B.R. 490, 499 (Bankr. N.D. Tex. 2011) (quoting *Midway,* 406 F.3d at 238).[40]

A third problem for both the §365(d)(3) Superpriority Claim Approach and the §365(d)(3) Administrative Claim Approach is that if a case is converted from Chapter 11 to Chapter 7, then actually the §365(d)(3) claim not arising under §503(b) would end up with *lower* priority than "normal" administrative claims arising under §503(b). This is because §348(d) provides that claims arising in a Chapter 11 case that is then converted to Chapter 7 are treated as prepetition claims (and thus given a lower payment priority), with only one exception—"*other than a claim specified in section 503(b)*."[41]

---

[39] *See, e.g.*, §726(b), §507(b).
[40] *Simbaki,* 2015 WL 1593888, at *3.
[41] §348(d) (emphasis added). *See Bella Logistics,* 583 B.R. at 679–82; *Simbaki,* 2015 WL 1593888, at *3–4.

ORDER DENYING MOTION TO COMPEL PAYMENT OF POST-PETITION RENT 10

These problems all guide the Court away from both the §365(d)(3) Superpriority Claim Approach and the §365(d)(3) Administrative Claim Approach. They support the conclusion that the best reading of the statute as a whole is the Automatic §503(b) Claim Approach—classifying §365(d)(3) claims along with other administrative claims arising under §503(b).

One final note. The Landlord argues that its view is supported by the legislative history and purpose of §365(d)(3), in specific, the intent to protect landlords and lessors from becoming "involuntary creditors" to a debtor-lessee that does not perform its obligations under its lease.[42] It is true that §365(d)(3) and several related provisions provide some protection to landlords and lessors. But, as noted, even the Automatic §503(b) Claim Approach brings significant benefits to the Landlord compared to most other administrative claimants. In addition, while this approach may end up disfavoring lessors in some Subchapter V cases, it benefits them in cases that convert from Chapter 11 to Chapter 7.[43] A broadly stated pro-lessor "legislative purpose," even if the Court were to use it as a guide, would not resolve the interpretive impasse between the potential approaches at issue here.

The Automatic §503(b) Claim Approach seems clearly the best in light of the statute as a whole.[44] Generalizations from legislative history and broad characterizations about Congressional purpose do not unseat that interpretation or shed much light on the issue.

---

[42] *See, e.g.*, *In re CEC Entm't, Inc.*, 625 B.R. 344, 352 (Bankr. S.D. Tex. 2020) (§365(d)(3) "was added to the Bankruptcy Code to prevent commercial lessors from unwillingly extending credit to debtor-lessees during the pendency of a chapter 11 case.").

[43] *Bella Logistics,* 583 B.R. at 679–682; *Simbaki*, 2015 WL 1593888, at *4 (landlord's §503(b) administrative claim retains priority if a case is converted from chapter 11 to chapter 7).

[44] The Fifth Circuit has articulated the appropriate interpretive principle thus:

> "[I]t is a 'cardinal rule that a statute is to be read as a whole,' in order not to render portions of it inconsistent or devoid of meaning." *Zayler v. Dep't of Agric. (In re Supreme Beef Processors, Inc.)*, 468 F.3d 248, 253 (5th Cir. 2006) (en banc) (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 n.7, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003)); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) (Under the harmonious-reading canon, "[t]he provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").

*In re Glenn*, 900 F.3d 187, 190 (5th Cir. 2018).

### B. Other remedies are available for failures to make timely §365(d)(3) payments.

The Automatic §503(b) Claim Approach does not give debtors free rein to ignore §365(d)(3), forcing landlords to fund the bankruptcy case with a mere promise of payment in a distant future. Courts have other remedies at their disposal even under the Automatic §503(b) Claim Approach. If a debtor is lingering for months without paying or if the landlord promptly moves for relief, courts can provide other remedies, such as lifting the automatic stay to permit landlords to seek eviction or shortening the time frame in which debtors may decide whether to assume or reject the contract.[45] With these forms of relief available, landlords who act expeditiously to protect themselves face little vulnerability as a result of unpaid §365(d)(3) claims.[46]

In addition, bankruptcy courts generally have significant discretion in ordering the payment of administrative claims.[47] Where there is a significant risk or likelihood of administrative fees not being paid—of the estate being "administratively insolvent," in bankruptcy parlance—courts may grant immediate payment (such as the payments requested by the Landlord in this case) or other relief. The Court will consider that possibility in this case in Section E below.

### C. The two-year, now-sunsetted, Covid-era amendment does not undermine the Automatic §503(b) Claim Approach.

In December 2020, in response to the ongoing effects of the Covid-19 pandemic, Congress passed amendments to the Code, mostly intended to relieve

---

[45] *In re Tammey Jewels, Inc.*, 116 B.R. 292, 294 (Bankr. M.D. Fla. 1990).
[46] Furthermore, the opposite ruling could, as the *Tammey Jewels* court pointed out, reward opportunism by the *landlord*. *See id.*
[47] *See, e.g., Varsity Carpet Servs., Inc. v. Richardson (In re Colortex Indus., Inc.)*, 19 F.3d 1371, 1384 (11th Cir. 1994) ("The determination of the timing of payment of administrative expenses is a matter within the discretion of the bankruptcy court."); *In re Verity Health Sys. of California, Inc.*, 2018 WL 5281624, at *4 (Bankr. C.D. Cal. Oct. 22, 2018) (collecting sources).

various burdens on debtors.[48] Most of these provisions were then left to sunset one or two years later.[49]

Among the changes to the Code was one that bears directly on the interpretation of §365(b). The change inserted new subsections into §365(d)(3), allowing for a further extension of the date by which the debtor must begin making §365(d)(3) payments if the delay was due to Covid-related hardships, and expressly allowing §365(d)(3) payments resulting from the delay to be "treated as an administrative expense under §507(a)(2) for the purpose of §1191(e)."[50] Unpacking this a bit: Section 507(a)(2) is where the Code provides for the high priority payment of "administrative expenses allowed under §503(b)." Section 1191(e) is a provision of Subchapter V that allows for §507(a)(2) claims to be paid over time in a plan of reorganization, unlike in normal Chapter 11 cases, where such expenses must be paid in cash up front as soon as a plan becomes effective.[51]

The statute then provided for the §365(d)(3) amendments to sunset after two years.[52] This sunsetting happened on December 27, 2022.

In essence, while it was in effect, and for situations to which it applied, the amendment arguably confirmed the view that §365(d)(3) payments should be allowed under §503(b) and prioritized under §507(a)(2). In other words, it mandated the Automatic §503(b) Claim Approach—*in that situation and for that time*.[53]

---

[48] *See* Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, §320, tit. X, §1001, 134 Stat. 1182 (116th Congr. Dec. 27, 2020).

[49] *See, e.g.*, *id.* at §320 (§364 Note striking 11 U.S.C. §364(g) two years after the date of enactment); tit. X §1001 (§541 Note striking 11 U.S.C. §541(b)(9-11) one year after the date of enactment), (§1328 Note striking subsection (i) one year after the date of enactment).

[50] *Id.* at tit. X §1001(f) ("An obligation described in subparagraph (A) for which an extension is granted under subparagraph (B) shall be treated as an administrative expense described in section 507(a)(2) for the purpose of section 1191(e).").

[51] *Compare* §1129(a)(9)(A) (§507(a)(2) claims must be paid in cash in full on the effective date of the plan), *with* §1191(e) (stating that §507(a)(2) claims may be paid out through the plan, thus implicitly permitting such claims to be paid otherwise than in cash and in full on effective date). Note that, for reasons that are not clear, §1191(e) only provides this relief when the plan is confirmed on a nonconsensual basis pursuant to §1191(b).

[52] Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, §320, tit. X, §1001, 134 Stat. 1182 (116th Congr. Dec. 27, 2020) (§365 Note striking the amendments to §365(d)(3) two years after the date of enactment).

[53] It then further confirmed that those claims could be paid over time in a plan per §1191(e), as the Debtor proposes to do in this case, *see* section E below.

But what does this amendment, temporary and limited as it was, clarify about the approach to §365(d) in *other* situations? And what about now, after the provision was allowed to sunset? Does or should the amendment change our understanding of how to treat claims arising from failure to make payments under §365(d)(3)?

One argument relies on a sort of negative implication or *expressio unius* principle: By providing for this interpretation to apply for two years and in particular circumstances, but then allowing it to lapse, Congress intended to say that this interpretation should *only* be valid in those circumstances and *only* for those two years. By letting the provision sunset, Congress implicitly told us that this approach was no longer correct (even in those narrow circumstances) and that we must look to another—perhaps the §365(d)(3) Superpriority Claim Approach advocated by the Landlord. In essence, by endorsing the Automatic §503(b) Claim Approach for a short time and a particular circumstance, Congress intended to ratify *other* approaches for all other times and circumstances. True, Congress didn't make clear *which* other approach it was ratifying, but the point is, it intended to *bar* the Automatic §503(b) Claim Approach even in courts that had adopted it long before this amendment.

This Court is not persuaded by that argument. It is not exactly hiding elephants in mouseholes,[54] but still, it is an interpretive stretch. Reading statutory meaning into Congressional *inaction* is a tricky business under the best of circumstances.[55] Our legislative system is set up so that there are many veto points before a bill can become a law, and as is well known,[56] the opposition or even the apathy of one of a number of powerful agenda-setting legislative actors may stop the passage of a bill. This may occur not because of any particular opposition but simply a commitment

---

[54] *Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 468 (2001) (per Scalia, J.) ("Congress . . . does not, one might say, hide elephants in mouseholes."))

[55] *See, e.g.*, William N. Eskridge, Jr., *Interpreting Legislative Inaction*, 87 Mich. L. Rev. 67, 99 (1988) ("Given the variety of reasons, unrelated to the merits or legislative support, for the failure of an idea or a measure in Congress, Justice Frankfurter was surely right when he opined in *Hallock* that such considerations 'indicate that we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.'" (quoting *Helvering v. Hallock*, 309 U.S. 106, 121 (1940))).

[56] *See, e.g.*, Jack Sheldon, *I'm Just a Bill, on* School House Rock! Soundtrack (Rhino Records 1996), *available at* http://www.schoolhouserock.tv/Bill.html) (educational video recounting the numerous veto points that proposed legislation must pass before becoming a bill).

to other priorities, an unwillingness to spend legislative capital on a particular bill, or a myriad of other reasons strategic or substantive.

The particular circumstances of this provision give even more reason to pause. Congress had its work cut out for it, passing this provision as part of a massive law covering a vast number of areas of policy in a time of considerable national disturbance. Given this heavy lift, it understandably sought to lower the stakes somewhat by enacting narrow relief and sunsetting many of the provisions.

In addition, Congress legislated against the backdrop of the variegated existing case law on §365(d)(3) as well as the dearth of opinions applying the new Subchapter V's §1191(e).[57]

In light of all of that context, a better interpretation recommends itself. The now-sunsetted provisions in §365(d)(3) can be read to express the intention to provide some certainty, despite (1) the well-known disagreements about the priority or superpriority of §503(b) claims in the case law discussed above,[58] and (2) the lack of experience of courts with §1191(e), a new and untested provision in the Code.[59] This certainty was narrow (only applying to certain circumstances) and time-limited (only applying for two years), yet in the anxious days in which the amendment was passed, that may have been a significant legislative accomplishment.

But the amendment cannot easily be read as sending some sort of broader message—unseating what had, in the days before the amendment was passed, become a leading interpretation of §365(d)(3). For whatever reason, for several decades, Congress has tolerated a certain amount of disuniformity and has not sought

---

[57] "We 'assume that, when Congress enacts statutes, it is aware of relevant judicial precedent.'" *Securities & Exch. Comm'n v. Hallam*, 42 F.4th 316, 339 (5th Cir. 2022) (quoting *Ryan v. Valencia Gonzales*, 568 U.S. 57, 66 (2013)).

[58] As an aside, this diversity of approaches provides an answer to an argument advanced by the Landlord, which was essentially that, if the Automatic §503(b) Claim Approach is correct, then why would Congress need to legislate it? Is this legislation just surplusage? The answer is that not all courts followed the Automatic §503(b) Claim Approach, and so the legislation serves a purpose in bringing about a unity (albeit temporary) in interpretation, even if it doesn't change the results in courts that already followed the Automatic §503(b) Claim Approach.

[59] There are a few cases permitting administrative fees to be paid over time as contemplated by §1191(e). *See, e.g.*, *In re Urgent Care Physicians, Ltd.*, No. 21-24000, 2021 WL 6090985, at *7 (Bankr. E.D. Wis. Dec. 20, 2021). But there do not appear to be any cases applying §1191(e) in the §365(d)(3) context. The only mention is in dicta from the *Seven Stars* opinion cited by the Landlord. *In re Seven Stars on Hudson Corp.*, 618 B.R. 333, 347 n. 82 (Bankr. S.D. Fla. 2020).

fit to provide a lasting, definitive clarity concerning §365(d)(3); the Court is not persuaded that it did so via the quite circuitous route of this temporary, Covid-era provision.

### D. The facts and circumstances do not favor relief for the Landlord at this juncture.

The Landlord asserts that the Debtor is playing a game of "catch-me-if-you-can" in which by failing to comply with its §365(d)(3) obligations, the Debtor gains the advantage of paying the overdue rent in installments through the plan, because the Landlord didn't take immediate action to seek other remedies such as eviction. The Court agrees that perhaps obtaining the fullest relief under §365(d)(3) requires monitoring by a landlord. But as noted, if a debtor is thumbing its nose at its §365(d)(3) obligations, there are other remedies available to protect a landlord.

Such remedies do not appear appropriate here. There is one month of overdue rent. Before the end of that month, and before the Landlord had sought relief from this Court, the Debtor had already moved to reject the Alderwood Mall Lease.[60] It turned over the premises by the end of that month.[61] This situation doesn't have the hallmarks of gamesmanship or abuse that would merit immediate action by the Court.

The Court is cognizant of the fact that if administrative insolvency looms, the Landlord's claim may not be paid in full. But at this time, there is no evidence of administrative insolvency.

### E. Whether the Debtor can pay the Landlord's claim through the Plan is not yet ripe for determination.

As noted above, unlike traditional Chapter 11, Subchapter V of Chapter 11 permits the payment of administrative claims over time in a plan of reorganization.[62] In specific, §1191(e) of Subchapter V states that "a plan that provides for the payment through the plan of a claim of a kind specified in paragraph (2) or (3) of

---

[60] Dkt. No. 26 (the Debtor's motion to reject the Alderwood Mall Lease).
[61] Dkt. No. 32 (Motion seeking of only one month of rent); Dkt. No. 41 (the Debtor's Response stating that it surrendered the property).
[62] *Compare* §1129(a)(9)(A) (§507(a)(2) claims must be paid in cash in full on the effective date of the plan)*, with* §1191(e) (stating only that §507(a)(2) claims may be paid out through plan, impliedly permitting such claims to be paid otherwise than in cash and in full on effective date).

ORDER DENYING MOTION TO COMPEL PAYMENT OF POST-PETITION RENT 16

section 507(a) of this title may be confirmed under subsection (b) of this section."[63] The Debtor asserts that because (1) its post-petition, pre-rejection rent is an administrative claim allowed under §503(b), (2) such claims are classified under §507(a)(2) of the Code, and (3) this is a case under Subchapter V of Chapter 11 of the Code, then the Debtor can pay the Landlord's claim over time through the Plan. The Landlord contends that the Debtor should not be able to pay unpaid post-petition, pre-rejection rent over the life of its plan, and it cites dicta from another court in support of its position.[64]

While the analysis above suggests that the Debtor may be able to avail itself of §1191(e), the Court cannot determine this issue at present. When the Court heard the Motion, no plan had been filed, and the issue was not ripe. This ruling does not prejudice the Landlord's ability to challenge the Plan.

## Conclusion

**FOR THESE REASONS, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Motion to Compel Payment of Post-Petition Rent (Dkt. No. 32) filed by Alderwood Mall LLC is DENIED.

###

---

[63] It is not clear from the statute why a plan paying for administrative claims over time can only be confirmed under §1191(b), that is, as a non-consensual plan.
[64] *In re Seven Stars on Hudson Corp.*, 618 B.R. 333, 347 n. 82 (Bankr. S.D. Fla. 2020).